COURT OF APPEALS
DECISION
DATED AND FILED

March 30, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal Nos. 2021AP1793-CR**
**2021AP1794-CR**
**STATE OF WISCONSIN**

Cir. Ct. Nos. 2019CF64
2019CF87

**IN COURT OF APPEALS**
**DISTRICT IV**

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

 V.

DEMETRIUS M. BOYD,

   DEFENDANT-APPELLANT.

APPEALS from judgments of the circuit court for Grant County: ROBERT P. VAN DE HEY, Judge. *Affirmed*.

Before Kloppenburg, Fitzpatrick, and Nashold, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM. Demetrius Boyd appeals his convictions of two counts of battery by a prisoner.[1]  He argues that the circuit court erred in joining the charges for trial and in denying his request to represent himself at trial.  We reject Boyd's arguments and affirm.

## BACKGROUND

¶2    Boyd is an inmate at the Wisconsin Secure Program Facility ("WSPF").  In March 2019, the State charged Boyd with one count of battery by a prisoner.  The complaint alleges that, on February 19, 2019, three WSPF correctional officers escorted Boyd to a local hospital.  While at the hospital, Boyd became upset with the medical staff about his care.  Boyd then began insulting one of the officers ("Officer One")[2] with profanity-laced names and accusing the officer of being lazy and "sitting on his ass and collecting a paycheck."  He then told Officer One and another officer that he needed to use the restroom.  Once inside the restroom, the officers took Boyd out of his wrist restraints and allowed him to use the restroom.  In the restroom, Boyd moved toward Officer One and began striking him in the head, neck, and face area, injuring Officer One's lip and inflicting a cut above his left eyebrow.  We will refer to this case as "the hospital case."

¶3    In April 2019, the State charged Boyd with one count of battery by a prisoner, arising out of an incident that occurred three days after the incident in the

---

[1] These appeals were consolidated for briefing and disposition by an order, pursuant to WIS. STAT. RULE 809.10(3) (2021-22).  All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] To protect the privacy interests of crime victims, we do not use the officers' names. *See* WIS. STAT. RULE 809.86.

hospital case. It is undisputed that, on February 22, 2019, WSPF correctional officers came to Boyd's prison cell to remove him from his cell and transport him to the prison's Health Service Unit. As the cell door opened, Boyd kicked an officer ("Officer Two") in the stomach. We will refer to this case as "the prison case."

¶4 At the initial appearance in the hospital case, Boyd appeared pro se by video conference from a holding cell because he did not want to appear in person. When the circuit court called the case, Boyd responded, "Fuck you." Throughout the proceeding, Boyd refused to respond to the court's questions and yelled, sang, jumped up and down, and banged on objects.

¶5 Boyd was subsequently appointed counsel. Shortly thereafter, Boyd wrote a letter to the court, requesting a new attorney and alleging that his attorney did not obtain certain documents that Boyd requested. At the preliminary hearing that took place after the court received Boyd's letter, Boyd said that the documents concerned "[m]urder, rape, and kidnapping in regards to the alleged victims on this case" that targeted his family members, celebrities, and "very rich people." Boyd said that he had a son and he heard his son say through a speaker behind the cell wall, "I'm being raped and murdered, help me, help me." Boyd said that he did not trust his attorney and suggested his attorney might be a Department of Corrections staff member. At the end of the preliminary hearing, the court bound the case over for trial and ordered the appointment of a new attorney for Boyd. The court additionally ordered an evaluation of Boyd's competency.

¶6 The subsequent competency report concluded that Boyd was competent and had substantial mental capacity to understand the proceedings and to aid in his own defense. According to the report, Boyd had a diagnosis of a

3

personality disorder with antisocial and narcissistic features, but he displayed a factual and rational awareness regarding the allegations in the criminal complaints and demonstrated an accurate understanding of criminal trial proceedings and the functions of court principals. The report concluded that Boyd may be experiencing delusional thinking, but that his "bizarre thought content" did not appear to overlap with his understanding of the allegations against him.

¶7 The circuit court held a status conference in August 2019, at which Boyd's new appointed counsel was present. Boyd appeared by video and the circuit court muted Boyd multiple times during the conference for using profanity and continuing to talk when the court tried to speak.

¶8 At the status conference, Boyd said that he wished to proceed pro se. The court informed Boyd that he had the right to represent himself, but that it was not a good idea. The court expressed concern about Boyd's "bizarre thought pattern" referenced in the competency evaluation and whether Boyd would be able to abide by court rules. The court told Boyd:

> You can't represent yourself if you end up being removed from the courtroom for constantly interrupting the Court or for making … allegations that don't have any relevance to the particular proceedings. The Court's job is to make proceedings run efficiently, and I cannot do that if you're going off on these tangents and interrupting and basically the type of things we've seen at these proceedings before.
>
> I will afford you every measure of due process that your conduct and behavior will allow, and that includes the right to represent yourself if … I can determine that you are able to do that, but at this point [defense counsel's] going to come out and visit you and discuss these things with you, and you need to work with him to see if … you can work together and you can allow him to assist in your defense, because at this point I'm not confident that you will be able to abide by the court rules, that you will be able to act as your own attorney.

¶9     Boyd eventually agreed to have his attorney act as standby counsel at trial and assist him with forming his defense and contacting witnesses. Boyd additionally said that he wanted to try both cases separately because they involved separate incidents.

¶10    About a month and a half later, the circuit court held another status conference at which Boyd complained that his attorney and a defense investigator failed to obtain documentation supporting his claims. Boyd said that people were spying on him and that he had been talking to someone behind the wall of his cell who said that he was Boyd's son and the devil. Boyd's counsel expressed concern about Boyd's competency and the court stated that Boyd's report indicates "a history of bizarre complaints" but that "competency was found by the examiner and the Court." The court also inquired as to whether the cases would be tried separately or together. The prosecutor did not take a position. Defense counsel indicated that his "default" position was that they would be tried separately but that he would check with Boyd and inform the court by letter. The court said that "if [Boyd] wants them separate, that will be his right" and that it would be up to Boyd and his counsel.

¶11    Boyd's counsel subsequently referred Boyd for an evaluation to assess whether he was not guilty of the offenses by reason of mental disease or defect ("NGI"). The NGI evaluator diagnosed Boyd with antisocial personality disorder; paranoid personality disorder; and alcohol, cannabis and ecstasy use disorder. The evaluator noted that, when talking about the events leading to the current charges, Boyd indicated that he "had planned on getting even" with the officers "as a result of the abuse he had endured from the guards, authority figures, and possibly his family members." Boyd informed the evaluator that he had "developed and implemented a plan on how to physically assault the officers at an

opportune time." The evaluator concluded that Boyd "did not lack substantial capacity to either appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law." Instead, Boyd "described a well thought out plan to assault others to get even with them for the perceived injustices he has endured."

¶12 Boyd's counsel subsequently wrote a letter to the circuit court requesting to withdraw as Boyd's attorney because Boyd wished to proceed pro se. The court issued an order permitting Boyd's counsel to withdraw. At a February 2020 status conference, the court asked Boyd if he wanted another attorney appointed. Boyd responded that he did and the court encouraged him to cooperate with his new attorney.

¶13 The public defender's office appointed a third attorney for Boyd. At a subsequent hearing, Boyd refused to appear. His new attorney requested that the two cases be tried separately. The circuit court denied the request and scheduled one trial for both cases, explaining that the charges were the same and that they involved similar premeditation, motive, and lack of mistake. The court also noted that Boyd was "being difficult," had "shown a continual pattern to try to delay this matter," was uncooperative, and had "gone through" several attorneys. The prosecutor said that he would be filing a motion for joinder, but the court said that it was not necessary and that the two charges would be tried together. Addressing defense counsel, the court said:

> Mr. Boyd's behavior is maybe not one of the factors you'll see in the case law.
>
> ….
>
> But I guarantee you he'll try to fire you. He will ask you to investigate bizarre conspiracy theories. He will do everything he can because he doesn't want a trial, and

> he's going to get a trial on June 22nd. It's going to be both charges, and you're going to probably end up trying it with him sitting in a cell somewhere. So try to encourage him to cooperate with you, try to encourage him to understand that it's going to trial one way or the other, but you got a tough job in front of you, and he's going to try to fire you.

¶14 Following the hearing, the circuit court issued a written order consolidating the two cases for trial. The court concluded that consolidation was permissible under WIS. STAT. § 971.12(4). The court noted Boyd's lack of cooperation with both counsel and the court, including incidents in which he refused to leave his cell to appear in court. The court stated that consolidation would "significantly diminish [Boyd's] opportunity to continue his intentional effort to delay these cases." The court also concluded that joining the cases for trial would not unduly prejudice Boyd because evidence of each alleged battery would be admissible under WIS. STAT. § 904.04(2) if each case were tried separately, to "show proof of motive, intent, preparation, plan, or absence of mistake or accident." The court further noted that, in addition to the batteries alleged in these two cases, Boyd had previously been convicted of battery by prisoner and prisoner expelling bodily fluids "and therefore represents a court safety concern." Thus, the court concluded that "consolidating these two cases would greatly promote the goals of public safety and judicial economy." Separately, the court noted that further disruptive behavior by Boyd could result in forfeiture of the right to represent himself.

¶15 Boyd's attorney subsequently informed the circuit court by letter that he was preparing for trial without Boyd's cooperation. The court then wrote a letter to Boyd urging him to cooperate with his attorney. The court advised Boyd that he has the right to represent himself but that this right could be "forfeited by words or behavior." Two weeks before trial, Boyd's attorney filed a motion to

7

withdraw. The motion stated that Boyd was demanding that he investigate claims that the video evidence the State was using had been altered. The motion also stated that Boyd insisted that counsel investigate his allegations that there are connections between the victims in this case and Department of Corrections employees who are related to one of the victims in a prior case of Boyd's ("the DOC employee allegation"). The motion stated that Boyd provided little information for pursuing the requested investigation.

¶16 At the final pretrial hearing, Boyd appeared by video and said that he would like to proceed pro se because his attorney was not pursuing the investigation he had requested. Boyd then described a past incident several years ago in which he claimed to have been strip searched. He alleged that the video evidence the State used in that situation had been altered, which provided a basis to believe that the video the State intended to use for the prison case had likewise been altered. He also discussed the DOC employee allegation. After Boyd discussed his theories at some length, the court interrupted Boyd and, when Boyd would not stop talking, the court muted him. The court said that no competent attorney would "run down all these rabbit holes" and "chase these conspiracy theories" that Boyd urged. The court went on to say:

> [Y]ou've been found competent to assist in your defense. You have not been found competent to represent yourself.
>
> And just for the record, it appears that Mr. Boyd continues to rant on even though he's been muted and is not listening to me, but that is one of the reasons why he is unable to represent himself, because he doesn't understand the rules of evidence, he doesn't understand the limits of relevancy, and, in fact, he has [had] … issues in the past of controlling his behavior.

¶17     The circuit court denied counsel's motion to withdraw.  When the court tried to ask Boyd questions about the logistics of the trial, Boyd continued to shout and use obscenities, telling the court:  "Take my case to trial, because if you don't … there is going to be a mother fucking problem."

¶18     One week before trial, Boyd's attorney informed the circuit court by letter that Boyd wished to represent himself at trial.  On the morning of trial, Boyd's attorney argued that Boyd was competent to represent himself.  The court responded that almost every hearing ended up with Boyd being muted and that there was a likelihood that Boyd would be disruptive.  The court stated its concern that if Boyd were acting as his own attorney and his conduct required him to be removed, "then he would really be out of luck."  The court also referred to the statement in Boyd's competency evaluation regarding Boyd's "bizarre … thought patterns" and to Boyd's "conspiracy theory" that he was being set up.  After Boyd spoke extensively about the DOC employee allegation, including that DOC staff members were "taking bribes," the court interrupted:

> Mr. Boyd, I think if the record had to be made, you just made the record that … you're unable to represent yourself. You can't focus on what's relevant, which is what happened in 2019 allegedly.  We're not here to retry a case from 2008.  Every attorney you have had has tried to tell you that.  And no, we don't use criminal trials to go on a fishing expedition for some, I think what could be described as, outlandish conspiracy theory, which is all you have.  Last time we were in court I had to mute you so that I could continue my business.  I have given you an ample opportunity.  You have said the same thing about four times.  Now, we're going to go on with the trial.  I have made my ruling.

¶19     At trial, Boyd testified and admitted to both offenses.  Boyd testified that in both the hospital case and the prison case the officers made offensive

remarks that provoked him to attack them. The jury returned guilty verdicts on both counts of battery by prisoner. Boyd appeals.

## DISCUSSION

### I. Joinder.

*A. Standard of Review and Governing Legal Principles.*

¶20 Joinder is governed by WIS. STAT. § 971.12. A circuit court "may order 2 or more complaints, informations or indictments to be tried together if the crimes … could have been joined in a single complaint, information or indictment." Sec. 971.12(4). Joinder of separate crimes in a single complaint is appropriate if the crimes charged "are of the same or similar character or are based on the same act or transaction or on 2 or more acts or transactions connected together or constituting parts of a common scheme or plan." Sec. 971.12(1). "We construe WIS. STAT. § 971.12(1) 'broadly in favor of the initial joinder.'" *State v. Watkins*, 2021 WI App 37, ¶23, 398 Wis. 2d 558, 961 N.W.2d 884 (quoting *State v. Locke*, 177 Wis. 2d 590, 596, 502 N.W.2d. 891 (Ct. App. 1993)). "The purpose of joinder is to promote economy and efficiency in judicial administration and avoid multiple trials." *State v. Salinas*, 2016 WI 44, ¶43, 369 Wis. 2d 9, 879 N.W.2d 609. "The initial decision on joinder is a question of law that we review de novo." *Id.*, ¶30.

¶21 Even when joinder is permissible, the circuit court may order separate trials "[i]f it appears that a defendant … is prejudiced by a joinder of [the] crimes .…" WIS. STAT. § 971.12(3). "[T]he proper joinder of criminal offenses is presumptively non-prejudicial." *State v. Prescott*, 2012 WI App 136, ¶13, 345 Wis. 2d 313, 825 N.W.2d 515. "In order to rebut that presumption, the defendant

must show substantial prejudice to his defense; some prejudice is insufficient." ***Id.*** We affirm the circuit court's decision denying severance unless the court erroneously exercises its discretion. ***Salinas***, 369 Wis. 2d 9, ¶30.

### B. The Circuit Court Properly Joined Boyd's Cases for Trial.

¶22 Boyd argues that WIS. STAT. § 971.12 does not permit joinder of his cases for trial. Under its plain language, § 971.12(1) allows "joinder of charged crimes that are 'of the same or similar character' or that are 'connected together.'" ***Watkins***, 398 Wis. 2d 558, ¶24. "For separate crimes to be 'of the same or similar character,' the crimes must be 'the same type of offenses occurring over a relatively short period of time and the evidence as to each must overlap.'" ***Id.*** (citation omitted). To determine whether crimes are "connected together," we look to a variety of factors, including the following:

> (1) are the charges closely related; (2) are there common factors of substantial importance; (3) did one charge arise out of the investigation of the other; (4) are the crimes close in time or close in location, or do the crimes involve the same victims; (5) are the crimes similar in manner, scheme or plan; (6) was one crime committed to prevent punishment for another; and (7) would joinder serve the goals and purposes of § 971.12.

***Id.*** (quoting ***Salinas***, 369 Wis. 2d 9, ¶43).

¶23 We agree with the State that the two offenses are "connected together."[3] First, the charges are closely related in that they involve exactly the

---

[3] Boyd additionally argues that joinder was improper because the two charges are not "the same" or "of similar character." Our conclusion that joinder was proper because the two crimes are "connected together" is dispositive and, therefore, we need not address this argument. *See **State v. Salinas***, 2016 WI 44, ¶34, 369 Wis. 2d 9, 879 N.W.2d 609 (we may uphold joinder "based solely on the 'connected together' language" in WIS. STAT. § 971.12(1)).

same charge, battery by a prisoner. Second, they have several common factors of substantial importance and are similar in manner, scheme or plan. In both cases, the victims were WSPF correctional officers and Boyd violently attacked them while they were carrying out their work duties. Both offenses occurred while the officers were accompanying or attempting to accompany Boyd to medical appointments, at a time when Boyd was not shackled and was close enough to each officer that he could carry out the attacks. In addition, as noted in the NGI evaluation, Boyd "described a well thought out plan to assault others to get even with them for the perceived injustices he has endured" and had "developed and implemented a plan" to "physically assault the officers at an opportune time."

¶24 Third, the two crimes are close in time because they occurred only three days apart. The assault in the hospital case occurred on February 19, 2019, and the assault in the prison case occurred on February 22, 2019. *See, e.g.*, *Francis v. State*, 86 Wis. 2d 554, 561, 273 N.W.2d 310 (1979) (stating that incidents thirty-five days apart are close in time for purposes of joinder).

¶25 Fourth, joinder serves the purpose of WIS. STAT. § 971.12 by promoting judicial economy and efficiency. *See State v. Leach*, 124 Wis. 2d 648, 671, 370 N.W.2d 240 (1985) ("The purpose of the joinder provisions is to promote economy and efficiency [in judicial administration] and to avoid a multiplicity of trials.") (alteration in original; internal quotation marks omitted). As the State notes, "Having one trial decided by one jury charged with applying one criminal jury instruction to two sets of facts would save judicial and prosecutorial resources." This is particularly true in the instant case where, as noted repeatedly

by the circuit court, Boyd was often uncooperative and disruptive, causing delays in moving the cases forward.[4]

¶26     Thus, applying the *Salinas* factors, we conclude that the crimes are "connected together" as required by WIS. STAT. § 971.12(1).  As we now explain, Boyd's arguments to the contrary are not persuasive.

¶27     Boyd argues that the two incidents are not closely related because the incidents occurred on different days and in different locations, and involve different victims.  However, in order to be "connected together," the two crimes do not need to have the same victim or location, nor do they need to occur on the same day.  *See Francis*, 86 Wis. 2d at 561 (joinder proper where perpetrator attacked two different women, thirty-five days apart, within two blocks of each other).

¶28     Boyd also argues that the State did not allege a common motive for committing the two crimes.  He asserts that "[i]n the hospital case, the state alleged that Mr. Boyd was upset about his medical care," whereas "in the prison case, the state alleged that Mr. Boyd was out to get a particular victim, nothing to do with inadequate medical care."  However, this summary of the complaint in the

---

[4] Boyd argues that the circuit court improperly considered his "bad behavior;" however, he provides no authority or persuasive argument for this assertion.  We agree with the court that potential delay caused by a defendant's uncooperative and disruptive behavior is highly relevant to whether judicial economy and efficiency are served by joinder.

Boyd also argues that joinder of the two cases does not serve the purpose of judicial economy and efficiency under WIS. STAT. § 971.12(1) because there is no overlapping of evidence.  However, as previously noted, the overlapping evidence inquiry is a specific factor under the "similar character" analysis, not the "connected together" analysis.  Moreover, even if the overlapping evidence factor is properly considered as part of the "connected together" analysis, it cannot reasonably be disputed that joining the charges for trial promotes judicial economy and efficiency by avoiding multiple trials.

13

hospital case is not entirely accurate. Although the complaint indicates that in the hospital case Boyd was initially upset with the medical care he was receiving, the complaint is also clear that Boyd then turned his attention to Officer One, calling him names that had no connection to Boyd's medical care, including accusing him of being lazy and "sitting on his ass and collecting a paycheck." Therefore, contrary to Boyd's assertion, his conduct in the hospital case—like his conduct in the prison case—is indicative of animosity toward correctional officers.

¶29 In sum, we conclude that the two crimes are "connected together," warranting joinder under WIS. STAT. § 971.12(1) and (4).

### C. The Circuit Court Did Not Erroneously Exercise Its Discretion in Joining Boyd's Cases Because Joinder Was Not Substantially Prejudicial.

¶30 Boyd argues that, even if joinder is permissible under WIS. STAT. § 971.12(1), joinder should have been denied under § 971.12(3)[5] because he was prejudiced by the joinder. Specifically, Boyd argues that the circuit court erroneously exercised its discretion in concluding that evidence of one of the crimes would be admissible at the trial for the other crime, and that therefore consolidating the cases would not unduly prejudice Boyd. We disagree.

¶31 In determining whether joinder is prejudicial, we consider whether the same evidence that would be admissible at a joint trial would also be admissible as other acts evidence at the separate trial for each crime. *State v. Hall*,

---

[5] This provision states, in relevant part: "RELIEF FROM PREJUDICIAL JOINDER. If it appears that a defendant … is prejudiced by a joinder of crimes … in a complaint, information or indictment or by such joinder for trial together, the court may order separate trials of counts … or provide whatever other relief justice requires." WIS. STAT. § 971.12(3).

14

103 Wis. 2d 125, 141-42, 307 N.W.2d 289 (1981). Our supreme court has developed a three-prong test to guide courts in determining whether other acts evidence is admissible under WIS. STAT. § 904.04. *State v. Sullivan*, 216 Wis. 2d 768, 772-73, 576 N.W.2d 30 (1998). Other acts evidence is admissible:

> (1) if it is offered for a permissible purpose, other than the prohibited propensity purpose, pursuant to Wis. Stat. § 904.04(2)(a), (2) if it is relevant under the two relevancy requirements in Wis. Stat. § 904.01, and (3) if its probative value is not substantially outweighed by the risk or danger of unfair prejudice under Wis. Stat. § 904.03.

*State v. Marinez*, 2011 WI 12, ¶19, 331 Wis. 2d 568, 797 N.W.2d 399 (citing *Sullivan*, 216 Wis. 2d at 772-73 (footnote omitted)). Applying these factors, we conclude that the circuit court properly exercised its discretion in concluding that joinder did not result in "substantial prejudice" to Boyd. *See Prescott*, 345 Wis. 2d 313, ¶13.

¶32 Regarding the first *Sullivan* prong, we note that examples of permissible purposes include "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *See* WIS. STAT. § 904.04(2)(a). Here, the circuit court concluded that evidence of each crime would be admissible in the other case to show proof of motive, intent, preparation, plan, or absence of mistake or accident. The record supports the court's conclusion. Both offenses demonstrated a common motive and intent to inflict bodily harm on WSPF correctional officers. They also show a common plan of taking advantage of the officers' proximity to Boyd to physically attack the officers while they accompanied or attempted to accompany Boyd to medical appointments, during which time Boyd was unshackled. The offenses showed that Boyd purposely targeted WSPF correctional officers for assault, demonstrating

15

intent and absence of mistake or accident.  Accordingly, the other acts evidence would be admissible under the first prong of the *Sullivan* test.

¶33   As to the second *Sullivan* prong, "[t]here are two parts to a relevancy analysis:  first, 'whether the evidence relates to a fact or proposition that is of consequence to the determination of the action,' and second, 'whether the evidence has a tendency to make a consequential fact more probable or less probable than it would be without the evidence.'"  *State v. Hurley*, 2015 WI 35, ¶77, 361 Wis. 2d 529, 861 N.W.2d 174 (quoting *Sullivan*, 216 Wis. 2d at 785-86).

¶34   When answering the first question, the court focuses its attention on the pleadings and the contested issues of the case.  *Hurley*, 361 Wis. 2d 529, ¶78.  According to the criminal complaints, the contested issues for proving battery by a prisoner under WIS. STAT. § 940.20(1) are whether, at the time of the offenses, Boyd was a prisoner confined to WSPF and whether he intentionally caused bodily harm to WSPF correctional officers without the officers' consent.  *See also* § 940.20(1) ("Any prisoner confined to a state prison … who intentionally causes bodily harm … to an officer … of such prison … without his or her consent, is guilty of a Class H felony.").  As stated, the evidence is relevant to show Boyd's intent to inflict bodily harm on WSPF correctional officers, "a fact or proposition that is of consequence to the determination of the action."  *See Hurley*, 361 Wis. 2d 529, ¶77.

¶35   "'The second part of the relevancy analysis illustrates the evidence's probative value, which is also part of the third prong of the *Sullivan* test.'"  *Id.*, ¶79 (quoted source omitted).  "'The measure of probative value in assessing relevance is the similarity between the charged offense and the other act.'"  *Id.* (quoted source omitted).  "Similarity is demonstrated by showing the 'nearness of

time, place, and circumstance' between the other-act and the charged crime." ***Id.*** (quoted source omitted). Under this standard, the two offenses are very similar. The offenses occurred three days apart, demonstrating nearness of time. Boyd also carried out both attacks on the WSPF officers while they were accompanying him or attempting to accompany him to a medical appointment and while he was unshackled, showing similarity in circumstance. Accordingly, we conclude that the evidence of each case is relevant to the other because they relate to facts of consequence to each case and would have high probative value at the trial of the other offense.[6]

¶36    The third step of the ***Sullivan*** analysis requires us to determine "whether the circuit court erroneously exercised its discretion in weighing the probative value of the other acts evidence against the danger of unfair prejudice, confusion of the issues, or misleading the jury, or considerations of undue delay, waste of time or needless presentation of cumulative evidence." ***Sullivan***, 216 Wis. 2d at 789. Probative value reflects the evidence's degree of relevance, in that "evidence that is highly relevant has great probative value, whereas evidence that is only slightly relevant has low probative value." ***Hurley***, 361 Wis. 2d 529, ¶87 (quoted source omitted). "Unfair prejudice results when the proffered evidence ... appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish or otherwise causes a jury to base its decision on something other than the established propositions in the case." ***Sullivan***, 216 Wis. 2d at 789-90.

---

[6] Boyd also argues that the circuit court "did almost no relevancy analysis" in determining whether joinder would be prejudicial, and "[t]his alone is an erroneous exercise of discretion." However, "[w]hen a circuit court fails to set forth its reasoning, appellate courts independently review the record to determine whether it provides a basis for the circuit court's exercise of discretion." ***State v. Sullivan***, 216 Wis. 2d 768, 781, 576 N.W.2d 30 (1998). Here, the record demonstrates that evidence of each of the two incidents is relevant to the other.

17

¶37    We have already concluded that the evidence from each case is relevant and has high probative value in the other case due to the similarity in character between the two offenses.  On the issue of prejudice, Boyd argues that the State's evidence in the prison case was stronger than the evidence in the hospital case because, unlike in the hospital case, which relied solely on the officers' testimony, the State had video evidence in the prison case.  He argues that "[p]resentation of a single battery with no video evidence is likely to raise some doubt in jurors' minds," but "when that same case is presented alongside a second battery, this one with video evidence, a jury is much more likely to believe that the first battery occurred."   This argument rests on speculation and unsupported premises.  Boyd fails to persuade us that a jury would have had doubts about the officers' testimony in the hospital case simply because there was no video recording of these events that occurred in a bathroom.  Nor has he shown that introduction of evidence from the prison case would likely tip the scales in the hospital case.

¶38    Instead, the record supports the conclusion that the probative value of the other-act evidence is not "substantially outweighed" by the risk of "unfair prejudice." *Marinez*, 331 Wis. 2d 568, ¶19.  The offenses were similar in nature and the facts of one were not substantially more shocking than the other, such that the evidence would appeal to the jury's sympathies, arouse its sense of horror, or otherwise cause the jury "to base its decision on something other than the established propositions in the case." *Sullivan*, 216 Wis. 2d at 789-90.

18

¶39 In sum, we conclude that the circuit court did not erroneously exercise its discretion in joining the cases because Boyd cannot show that joinder was substantially prejudicial.[7]

## II. Self-Representation.

### A. Standard of Review and Principles Governing Competency.

¶40 Article I, section 7 of the Wisconsin Constitution and the Sixth Amendment of the United States Constitution guarantee both a criminal defendant's right to counsel and the right to defend oneself. *State v. Klessig*, 211 Wis. 2d 194, 201-03, 564 N.W.2d 716 (1997). When a defendant seeks to proceed pro se, the circuit court must ensure that the defendant: (1) has knowingly, intelligently, and voluntarily waived the right to counsel; and (2) is competent to proceed pro se. *Id.* at 203.

¶41 "Whether a defendant was denied his or her constitutional right to self-representation presents a question of constitutional fact, which this court determines independently." *State v. Imani*, 2010 WI 66, ¶19, 326 Wis. 2d 179, 786 N.W.2d 40.[8] "In order to determine whether a defendant knowingly,

---

[7] The State makes two additional arguments in support of the circuit court's joinder of the charges. First, the State argues that Boyd forfeited his prejudice claim under WIS. STAT. § 971.12(3) because he never filed a motion to sever or a postconviction motion alleging ineffective assistance for failure to file such a motion. *See Salinas*, 369 Wis. 2d 9, ¶49, ("Failing to make a severance motion, regardless of the reason, however, results in this issue not being ripe for our consideration."). Second, the State argues that any error in joining the cases was harmless because Boyd admitted to both assaults at trial. Because we affirm the circuit court's decision for the reasons set forth in this opinion, we need not address the State's additional arguments. *See Barrows v. American Fam. Ins. Co.*, 2014 WI App 11, ¶9, 352 Wis. 2d 436, 842 N.W.2d 508 (2013) ("An appellate court need not address every issue raised by the parties when one issue is dispositive.").

[8] The parties dispute the continued vitality of our supreme court's decision in *State v. Imani*, 2010 WI 66, ¶19, 326 Wis. 2d 179, 786 N.W.2d 40, in light of the decision by the Seventh

(continued)

intelligently, and voluntarily waived the right to counsel, we apply constitutional principles to the facts of the case." *Id.* "We review those facts independent of the circuit court." *Id.* "However, a circuit court's determination that a defendant is incompetent to proceed pro se 'will be upheld unless totally unsupported by the facts.'" *Id.* (quoted source omitted). "We review a circuit court determination of whether a defendant is competent to proceed pro se under what is 'essentially a clearly erroneous standard of review.'" *State v. Marquardt*, 2005 WI 157, ¶21, 286 Wis. 2d 204, 705 N.W.2d 878 (quoted source omitted). "'It is the trial judge who is in the best position to observe the defendant, his conduct and his demeanor and to evaluate his ability to present at least a meaningful defense.'" *Imani*, 326 Wis. 2d 179, ¶37 (quoted source omitted). Here, the State concedes that Boyd knowingly, intelligently, and voluntarily waived his right to counsel. Thus, the dispute in this case centers on the second inquiry, Boyd's competency to represent himself.

¶42 "Determining whether a defendant is competent to proceed pro se is a higher standard than determining whether a defendant is competent to stand trial." *Id.*, ¶36. "In determining whether a defendant is competent to proceed pro se, the circuit court may consider the defendant's education, literacy, language fluency, and any physical or psychological disability which may significantly affect his ability to present a defense." *Id.*, ¶37; *see also* **Klessig**, 211 Wis. 2d at 212. "[T]he competency determination should not prevent persons of average

---

Circuit Court of Appeals six years later in *Imani v. Pollard*, 826 F.3d 939, 942 (7th Cir. 2016). The *Pollard* court granted Imani's petition for federal habeas corpus relief and concluded that our supreme court's holding in *Imani* is contrary to *Faretta v. California*, 422 U.S. 806 (1975). We need not address the parties' arguments on this issue because our opinion is consistent with both the federal courts' and our state supreme court's decisions.

ability and intelligence from representing themselves unless 'a specific problem or disability can be identified which may prevent a meaningful defense from being offered, should one exist.'" *Klessig*, 211 Wis. 2d at 212 (quoted source omitted).

### B. The Circuit Court's Competency Determination Was Not Clear Error or Totally Unsupported by the Facts of Record.

¶43 For the reasons that follow, we conclude that the circuit court did not clearly err in concluding that Boyd was not competent to represent himself, nor was the court's determination totally unsupported by the record. As previously stated, in assessing competency, the circuit court may properly consider a defendant's "psychological disability," *Imani*, 326 Wis. 2d 179, ¶37, or "'a specific problem or disability … which may prevent a meaningful defense from being offered,'" *Klessig*, 211 Wis. 2d at 212 (quoted source omitted). Here, the facts of record amply support the conclusion that Boyd experienced such a problem or disability, such that his ability to represent himself was severely hampered. As noted by the circuit court, although Boyd was found competent to stand trial, this does not mean he was competent to represent himself.

¶44 Notably, the competency evaluator reported that Boyd had "bizarre thought content" and that, contrary to evaluations in the past that suggested he might be feigning symptoms, Boyd may be "experiencing genuine delusional thinking."[9] For example, Boyd told the evaluator that he believed his son and

---

[9] Boyd suggests that the competency evaluator concluded that Boyd does not suffer from any major mental illness and that the evaluator endorsed the view that Boyd was not delusional. Boyd also notes that the circuit court "acknowledged that the doctors think Mr. Boyd is 'faking it.'" However, it is clear from the competency evaluator's report that the evaluator questioned these previous views from other professionals, stating, "On the other hand, there is presently no clear, identifiable secondary gain for Mr. Boyd to make such potentially delusional complaints, thus leaving the possibility that he is experiencing genuine delusional thinking."

mother were being raped behind the wall of his cell and that he could hear a male and female having sex and saying, "we back here." The competency evaluator diagnosed Boyd with a personality disorder with antisocial and narcissistic features. Additionally, Boyd's NGI evaluator diagnosed him with antisocial personality disorder and paranoid personality disorder. The NGI evaluator stated that Boyd's "recollection of historical events appeared to be significantly influenced by his reported paranoid beliefs" and that his "level of insight and judgment appear to be impaired." In denying Boyd's request to represent himself, the court relied on the competency report's statement that Boyd had "bizarre thought content."

¶45 The record additionally shows that Boyd repeatedly asserted in circuit court that he was the victim of a difficult-to-follow conspiracy, that "people that are a part of this certain organization" are "spying on" him, and that he had been communicating with someone behind the wall of his cell who claimed to be his son and the devil. These facts of record show that Boyd had significant mental health issues that could meaningfully affect his ability to represent himself.

¶46 Relatedly, during various court proceedings, Boyd engaged in conduct showing that he was not competent to represent himself. As previously noted, in addition to refusing to come to the courtroom on more than one occasion, at the initial appearance in the hospital case, Boyd responded, "Fuck you," when the circuit court called the case and, throughout that proceeding, yelled, sang, jumped up and down, and banged on objects. At various proceedings, Boyd repeatedly went on tangents (usually about a purported conspiracy), interrupted the court on multiple occasions, and frequently had to be muted during video appearances so that the court could carry on with the proceeding. In concluding Boyd was not competent to represent himself, the circuit court specifically

22

mentioned Boyd's problems with controlling his behavior. The court stated its concern that if Boyd were representing himself and his conduct required him to be removed, "then he would really be out of luck," meaning that Boyd would have no representation in the courtroom. The court also determined that Boyd was not competent to represent himself because, as evidenced by his repeated and lengthy digressions and his failure to address the allegations in the case, Boyd did not understand "the rules of evidence" or "the limits of relevancy." Boyd has not shown that the court clearly erred in relying on these facts and reaching the determination that Boyd was not competent to proceed pro se.

¶47 Boyd argues that, to the extent the circuit court was concerned about Boyd's defense veering into irrelevant tangents or bad behavior, the court "had tools at its disposal [to] address these concerns," such as excluding evidence, keeping counsel on standby, and excluding Boyd from proceedings if he became disruptive. However, the circuit court was "'in the best position to observe the defendant, his conduct and his demeanor and to evaluate his ability to present at least a meaningful defense.'" *Imani*, 326 Wis. 2d 179, ¶37 (quoted source omitted). Because Boyd has not shown that the court's competency determination is clearly erroneous or "totally unsupported" by the record, we affirm the court's decision.[10]

---

[10] Because we affirm the circuit court's determination that Boyd was not competent to represent himself, we do not address the State's additional arguments that Boyd forfeited his right to represent himself by his obstreperous conduct and that Boyd's request to represent himself was untimely. *See* **Barrows**, 352 Wis. 2d 436, ¶9.

23

**CONCLUSION**

¶48    For the reasons stated, we conclude that the circuit court properly joined Boyd's cases for trial and properly denied his request for self-representation. Accordingly, we affirm.

*By the Court.*—Judgments affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.